UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------x
EDNA BOLDEN,                   :
                              :
              Plaintiff,      :
                              :
v.                            :      Civil No. 3:07CV785(AWT)
                              :
JOHN POTTER, POSTMASTER       :
GENERAL, UNITED STATES POSTAL :
SERVICE                       :
                              :
              Defendant.      :
------------------------------x
```

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Edna Bolden, has brought this action against John Potter, Postmaster General of the United States Postal Service, setting forth claims of racial discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII") and intentional infliction of emotional distress.  The defendant has moved for summary judgment on all three counts.  For the reasons stated below, the motion is being granted in part.

## I.  FACTUAL BACKGROUND

The plaintiff is African American of race and black of color.  She held various temporary or casual positions with the United States Postal Service from 1996 to 2000.  In April of 2001 she was hired to work as a Temporary Relief Carrier at the East Granby, Connecticut post office, and in August of 2003 she was appointed to the position of Regular Rural Carrier, which she

held until her resignation in May 2007.

Bolden complains that she was mistreated by her supervisor, Susan Adams ("Adams"), and her coworkers beginning March 10, 2006.  This mistreatment continued until Bolden resigned from the Post Office on May 10, 2007.  Adams became Postmaster at the East Granby Post Office in or about June 2005, having transferred from a different post office in Connecticut.

Bolden's mistreatment began after she took the day off on March 10, 2006 to go to the doctor.  She had called Adams the day before to request the day off, but Adams had been unable to talk. When Bolden returned to work, Adams complained that it was Bolden's job, and not hers, to deliver mail.  Bolden felt that everyone knew why she had taken the day off.

After this incident, a number of other incidents occurred that led to Bolden's resignation.  First, when sorting the mail in May 2006, Adams threw a parcel that hit Bolden.  Although Bolden does not believe that Adams intentionally hit her with the parcel, she was upset that Adams did not apologize, and that Adams shortly thereafter yelled at Bolden for a comment she made to another co-worker, Bonnie Spring ("Bonnie").

Also in May 2006, Bolden attempted to transfer to a post office in Savannah, Georgia.  Record of her employment as a mail carrier in Hartford in the 1990s was not located, and Bolden did not get her requested transfer.

2

On May 31, 2006, Bolden requested an appointment with a dispute resolution specialist with the United States Postal Service because she felt that she was being discriminated against because of her color and race.

In addition, Bolden frequently found the toilet had not been flushed when she entered the ladies' restroom at work.  She complained to Adams that Bonnie was doing this intentionally. Adams flushed the toilet and eventually called a plumber to look at the problem.

Bolden also felt that Adams would not let her talk to her coworkers, who had formed a clique excluding her.  This clique included Andrew Daigle ("Andy"), who substituted for Bolden, Carol August ("Carol"), another rural carrier, and Nasheba Blackwood ("Nash"), an African-American clerk hired by Adams. Nash acted as supervisor when Adams was absent.

Adams established a number of policies and procedures at the East Granby Post Office that Bolden followed and other employees did not.  Bolden generally finished her deliveries before her co-workers, but on the few occasions she arrived after them, she saw that they had left their misdelivered mail in bags, rather than sorting it before leaving.  In addition, Adams began to enforce a policy that carriers could no longer call to check whether customers were at home before they delivered express mail. Bolden saw Bonnie and Carol continue to call before delivering

their express mail.  Bolden also was told she could not have her
cellular phone at work, although other employees continued to
have theirs.

Bolden also received reports from customers on her route
about misdelivered mail with increasing frequency.  She began to
place all mail she delivered to a given customer in a rubber-band
and on at least one occasion drove around her route after
finishing her deliveries to see if someone was tampering with the
mailboxes.  On that occasion she saw Andy, who lived elsewhere on
her route, drive past her.

In February 2007, Bolden received a seven day paper
suspension, later reduced to a warning, for failing to promptly
report a workplace injury when she broke a finger.  She did not
report the injury when it happened, but called Nash, who was
acting as supervisor, to report it later that day, after she had
left work.  She did not receive workers compensation for the
injury, despite being entitled to it.

Finally, Bolden complains that she did not receive a raise
in her salary in the year that Adams was Postmaster, but had
received a raise every year under her previous Postmaster.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such issue

4

warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact.

Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." <u>Id.</u>  As the Court observed in <u>Anderson</u>: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  <u>Id.</u>  Thus, only those facts that <u>must</u> be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment.  <u>See Howard v. Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (quoting <u>Delaware & Hudson Ry. Co. v.</u>

6

Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because
credibility is not an issue on summary judgment, the nonmovant's
evidence must be accepted as true for purposes of the motion.
Nonetheless, the inferences drawn in favor of the nonmovant must
be supported by the evidence.  "[M]ere speculation and conjecture
is insufficient to defeat a motion for summary judgment." Stern
v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997)
(internal quotation marks omitted) (quoting Western World Ins.
Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).
Moreover, the "mere existence of a scintilla of evidence in
support of the [nonmovant's] position will be insufficient; there
must be evidence on which [a] jury could reasonably find for the
[nonmovant]." Anderson, 477 U.S. at 252.

     Finally, the nonmoving party cannot simply rest on the
allegations in its pleadings since the essence of summary
judgment is to go beyond the pleadings to determine if a genuine
issue of material fact exists.  See Celotex Corp., 477 U.S. at
324.  "Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
Weinstock, 224 F.3d at 41, if the movant demonstrates an absence
of such issues, a limited burden of production shifts to the
nonmovant, who must "demonstrate more than some metaphysical
doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for

7

trial." <u>Aslanidis v. United States Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)(citation omitted) (emphasis omitted) (internal quotation marks omitted) Furthermore, "unsupported allegations do not create a material issue of fact." <u>Weinstock</u>, 224 F.3d at 41.  If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A.   Race and Color Discrimination

The plaintiff claims that the defendant subjected her to disparate treatment and a hostile work environment because of her race, which led to her constructive discharge.

#### 1.   Disparate Treatment

In order to make out a case of discrimination under Title VII, the plaintiff must first establish a <u>prima facie</u> case by demonstrating: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 138 (2d Cir 2008).

For purposes of this motion, the government has conceded that the plaintiff has satisfied the first two elements of her <u>prima facie</u> case.  Because the court concludes that the plaintiff has failed to create a genuine issue of material fact on the

question of whether the events described by the plaintiff
occurred under circumstances giving rise to an inference of
discriminatory intent, the court does not address the issue of
whether the plaintiff suffered an adverse employment action.

Although the Second Circuit has "repeatedly expressed the
need for caution about granting summary judgment to an employer
in a discrimination case where . . . the merits turn on a dispute
as to the employer's intent[,] . . . [e]ven in the discrimination
context, . . . a plaintiff must provide more than conclusory
allegations to resist a motion for summary judgment." Id. at 137.
In this case, the plaintiff has done no more than that.  As a
result, drawing all inferences in her favor, the plaintiff has
failed to create a genuine issue of material fact on the question
of whether the circumstances in this case give rise to an
inference of discriminatory intent.

The plaintiff has presented evidence that she was mistreated
by her coworkers and supervisor.  However, this is not enough to
meet her burden.  Compare Lizardo v. Denny's, Inc., 270 F.3d 94,
102 (2d Cir. 2001) ("Although mistreatment by defendants is not
irrelevant in assessing the strength of plaintiffs'
circumstantial evidence of race-based animus, it is certainly not
sufficient to establish it."); Wong v. Yoo, 649 F.Supp.2d 34, 69
(E.D.N.Y., 2009) (internal quotation marks omitted) ("Hostile
conduct may support an inference of discrimination, but is not

alone sufficient.") <u>with</u> <u>Holcomb</u>, 521 F.3d at 134 & 140 (holding that an official of the defendant's "habit of making racially offensive comments," "disapproval of [a white employee's] marriage to a black woman," and "willingness to act on [that] disapproval by insulting [the white employee] in public" permits an inference of discrimination).

As an initial matter, it should be noted that when asked if anyone at the Post Office ever said anything derogatory because of her race and color, Bolden responded that she didn't recall. Although "direct evidence of [discriminatory] intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination,'" a careful review of the evidence in this case demonstrates that no inference of discrimination can be drawn from this record. <u>Holcomb</u>, 521 F.3d at 137 (quoting <u>Gallo v. Prudential Residential Servs., Ltd.</u> <u>P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)). In fact, it is the plaintiff's own words that make this apparent. In her deposition, the plaintiff stated that "when [Adams] came [to the East Granby Post Office], at first, we had a good relationship." (Bolden Dep. 73.) It was only "when I called that time because I was sick . . . everything went downhill." (<u>Id.</u> 73-74.) The plaintiff also stated that Adams indicated her anger over that incident by saying "that [Adams] was the supervisor, she

10

shouldn't deliver mail.  That was my responsibility." (Id. 50.)
Later in her deposition, when asked why she thought Adams treated
her badly, the plaintiff stated "Because I asked for that day
off." (Id. 78.)  Counsel for the defendant followed up by asking,
"So, you believe that [Adams] was motivated by a desire to punish
you for taking the day off?" (Id.)  To which Bolden replied,
"Yes, yes." (Id.)  Thus, the plaintiff's own testimony
demonstrates that insofar as Adams mistreated her, it was because
of her request for a day off and Adams's negative reaction to
having the responsibility of making sure the mail on Bolden's
route was delivered.

    When asked what this has to do with her race, the only way
that the plaintiff herself could explain the issue was that "at
this point, I was the only black there," but immediately followed
this statement by saying "until Nash came onboard. [Adams]
brought Nash onboard." (Id. 79.)  Adams hired Nash, and Bolden
testified that Adams "was friendly to [Nash].  It was just me
[that Adams mistreated]." (Id. 164.)  These facts undermine any
inference that the plaintiff's mistreatment was because of her
race.  The plaintiff argues that the "Postal Service attempts to
mask Adams's discriminatory conduct with the veil of Nasheba
Blackwood," (Pl.'s Mot. [sic] Opp. Def.'s Mot. Summ. J. ("Pl.'s
Opp.) (Doc. No. 43) 18.), who was among the employees Bolden
claims mistreated her, because Nash, as a clerk, was not

similarly situated to the plaintiff, a rural mail carrier. (See
Pl.'s Opp. 18 n.7 & 19.)  However, no evidence has been
introduced that could suggest that the difference between the
position of clerk and that of rural mail carrier is material.[1]
In the small East Granby Post Office, all of the approximately 10
other employees were Adams's subordinates.  There is nothing in
the record to suggest that the different duties they may have
performed have any bearing on the issue of discrimination.

### 2.   Hostile Work Environment

To prevail on her hostile work environment claim, the
plaintiff "must make two showings: (1) that 'the harassment was
sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment'
and (2) that there is a 'specific basis for imputing the conduct
creating the hostile work environment to the employer.'" Dutch v.
Jakubek, 588 F.3d 757, 762 (2d Cir. 2009) (quoting Feingold v.
New York, 366 F.3d 138, 149-50 (2d Cir.2004)).

The first prong of the test "involves showing both objective
and subjective elements: the misconduct shown must . . . create
an objectively hostile . . . work environment, and the victim
must also subjectively perceive that environment to be abusive."

---

[1]Insofar as there is any evidence of differences between
Bolden's role and Nash's, it is not helpful to the plaintiff.
Although Nash was a clerk, and subordinate to Adams, he was also
an acting supervisor when Adams was absent. (See Bolden Dep.
109.)

Feingold, 366 F.3d at 150 (internal quotation marks omitted).
Relevant factors to consider include "'the frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with [the] employee's work
performance.'" Id. (quoting Harris v. Forklift Sys., Inc., 510
U.S. 17, 23 (1993).  Of course, to be covered by Title VII, the
harassment giving rise to the hostile work environment must be
"on the basis of 'race, color, religion, sex, or national
origin.'" Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001)
(quoting 42 U.S.C. § 2000e-2(a)(1)).  With regard to the second
prong, "an employer is presumed to bear absolute liability in
cases where, as here, the harassment is perpetrated by the
victim's supervisor, although an employer may interpose an
affirmative defense to rebut that presumption." Terry v.
Ashcroft, 336 F.3d 128, 148 n.20 (2d Cir. 2003).

In this case, the plaintiff has not created a genuine issue
of material fact as to whether any hostility in her work
environment was on the basis of her race or color.  Only the
plaintiff's unsubstantiated speculation suggests that race was a
factor.[2]  As noted above, the plaintiff testified in her

---

[2]See, for example, the following excerpt from the
plaintiff's deposition:
> Q    So, you believe that [Adams] was motivated by
>      a desire to punish you for taking the day
>      off?

deposition that her relationship with Adams was fine until she called in to take a day off from work.  Drawing all inferences in the plaintiff's favor and construing the totality of the evidence in her favor, Adams mistreated her because of a dispute over Bolden's missing work, not because of Bolden's race.  See discussion supra Part III.A.1.  As was the case in Leavenworth v. Potter, Civil Action No. 3:07-cv-00960 (VLB), 2009 WL 378642, at *5 (D. Conn. Feb. 13 2009), the plaintiff "has not provided evidence of any occasion on which . . . her ethnicity w[as] even mentioned by any of the people alleged to have created a hostile work environment."

Further, Adams hired and was friendly with Nash, an African-American.  As discussed above, while the plaintiff contends that Blackwood was not similarly-situated to her because she was a rural carrier and he was a clerk, there is no evidence to suggest that this was a material distinction.  Furthermore, insofar as Blackwood was not similarly-situated he was closer to Adams, as he took on the role of supervisor when she was absent.[3]

---

> A    Yes, yes.
> Q    And what does that have to do with your race?
> A    It has a lot to do with my race because at that point, I was the only black there until Nash came onboard. [Adams] brought Nash onboard.  She made sure that I was isolated by Nash and everybody else.

(Bolden Dep. 78-79.)

[3]The plaintiff also claims that she was constructively discharged.  In order to sustain a constructive discharge claim,

B.    **Retaliation**

It is an unlawful employment practice for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e-3(a).  As an initial matter, it should be noted that "Title VII's substantive provision and its antiretaliation provision are not coterminous."  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67 (2006).

> Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis. First, the plaintiff must establish a <u>prima</u> <u>facie</u> case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse

---

the plaintiff must "prove that her employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" <u>Ferraro v. Kellwood Co.</u>, 440 F.3d 96, 101 (2d Cir. 2006) (quoting <u>Pa. State Police v. Suders</u>, 542 U.S. 129, 141 (2004)).  Like the argument that an employer created a hostile work environment, the argument that an employee was constructively discharged represents a way to show that the employee was harmed by the employer's action, much like a disparate treatment claim requires the showing of an adverse employment action.  In this case, it does not appear that Bolden has shown that the defendant created working conditions so intolerable that a reasonable person in her position would have felt compelled to resign.  However, because Bolden has not created a genuine issue of material fact as to whether any unpleasant working conditions that she experienced created an inference of discrimination, as discussed above, she cannot in any event sustain her claim that she was constructively discharged in violation of Title VII.  <u>Cf.</u> <u>Terry</u>, 336 F.3d at 152 (finding that the plaintiff "has put forth sufficient evidence to allow a trier-of-fact to conclude that the constructive discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in a protected class.").

employment action; and (4) a causal connection
between the protected activity and the adverse
employment action.

Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (citation

omitted) (internal quotation marks omitted).

There is no dispute that the plaintiff has satisfied the

first two elements of her prima facie case of retaliation.  As to

the third element, "in determining whether conduct amounts to an

adverse employment action, the alleged acts of retaliation need

to be considered both separately and in the aggregate, as even

minor acts of retaliation can be sufficiently 'substantial in

gross' as to be actionable."  Id. at 165 (citing Zelnik v.

Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006)).  The

question is whether the conduct at issue was "harmful to the

point that [it] could well dissuade a reasonable worker from

making or supporting a charge of discrimination."  White, 548

U.S. at 57.  In considering the perspective of a reasonable

employee, "[c]ontext matters. . . .  The real social impact of

workplace behavior often depends on a constellation of

surrounding circumstances, expectations, and relationships

. . . ."  Hicks, 593 F.3d at 165 (alteration in original)

(internal quotation marks omitted).

As to the fourth element, proof of causation can be

demonstrated "'either: (1) indirectly, by showing that the

protected activity was followed closely by discriminatory

treatment, or through other circumstantial evidence such as
disparate treatment of fellow employees who engaged in similar
conduct; or (2) directly, through evidence of retaliatory animus
directed against the plaintiff by the defendant.'" Id. at 170
(quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d
Cir. 2000)).

Bolden complains of a number of incidents that occurred over
the course of the time she worked under Adams.  She claims that
Adams threw a parcel that hit her and yelled at her, failed to
help her to transfer to Georgia, allowed other workers to follow
different rules, failed to keep Bolden informed of procedural
changes in the office, issued unjustified discipline against her,
failed to give her a raise, and prevented her coworkers from
interacting with her.  Considering the record as a whole in the
light most favorable to her, the plaintiff has failed to create a
genuine issue of material fact as to whether she was subjected to
retaliation for activity protected by Title VII.

Bolden's complaint that Adams isolated her from her
coworkers cannot, on this record, qualify as an adverse
employment action, nor can the evidence support an inference that
there was a causal relationship between Bolden's social isolation
and her protected activity.  The Second Circuit has noted that
"by requiring a showing of material adversity, [the Supreme
Court's decision in Burlington Northern & Santa Fe Railway Co v.

17

White] preserves the principle that Title VII 'does not set forth "a general civility code for the American workplace."' . . . Thus, '[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" Hicks, 593 F.3d at 165 (quoting White, 548 U.S. at 68 & 67).  It further noted that "by considering the perspective of a reasonable employee, White bespeaks an objective standard."  Id.  The plaintiff describes no incident in which Adams actually limited her access to other coworkers that occurred after she made her EEO complaint.[4]  In describing her isolation, the plaintiff says that Adams "didn't want me to have anything to say to Bonnie or anybody," but she does not describe any act by Adams that would indicate a basis for this assertion as to Adams's intent. (Bolden Dep. 68.) The only incident that Bolden describes in which Adams was clearly aware of the way the plaintiff's coworkers interacted with her that did not clearly occur before any protected activity is one that occurred when the plaintiff's coworker Bonnie described Bolden's scratching the labels off a cabinet as a "rat scratching," and Adams "looked on admiringly." (Id. 68-69.)

---

[4]The incident in which Bolden describes being hit by a package that was being sorted by Adams, discussed below, also involves Adams's yelling at Bolden for making "snide remarks" to a coworker. (Bolden Dep. 67.)  However, as discussed below, this incident occurred before Bolden's protected activity and so cannot form the basis of her retaliation claim.

18

Bolden makes a number of unsubstantiated assertions in her deposition regarding her social position at the East Granby Post Office under Adams, including that she "wasn't allowed to talk to anybody," that Adams "used others," and that coworkers Andy and Bonnie "did [Adams's] dirty work." (Id. 94, 157, 66.) The record does not support these inferences.[5]

Bolden describes no incident after she engaged in any protected activity where Adams affirmatively stopped her from talking to a coworker, and even testified that Adams "didn't forbid" her from talking to her coworkers. (Bolden Dep. 119.) In fact, Bolden admitted that "I don't know if [Adams] did it," but her coworkers "wouldn't talk to [her]."[6] (Id.) On this record, the plaintiff's social experience at work satisfies neither the third nor the fourth prong of her prima facie case. See White, 548 U.S. at 68 ("An employee's decision to report

_____

[5]Bolden's testimony also indicates that her relationship with Bonnie was troubled before Adams arrived at the East Granby Post Office. Bolden testified that Bonnie "used to call [the plaintiff] [']Miss Goodie Two-Shoes,['] because I was a favorite, she said, of [the supervisor before Adams] . . . ." (Bolden Dep. 86.) As such, absent any further substantiation, Bolden's claims that Bonnie was rude to her cannot support the inference that Adams encouraged Bonnie to mistreat Bolden in retaliation for her protected activity.

[6]Bolden also testified that "Everybody in that office, they didn't have nothing to do with me, but it was very clear that they wanted Andy to have my position." (Bolden Dep. 86-87) Taking this statement as true, there is no evidence that her coworkers wanted Andy to have her position because of her protected activity.

discriminatory behavior cannot immunize that employee from those
petty slights or minor annoyances that often take place at work
and that all employees experience."); cf. McKenzie v. Milwaukee
County, 381 F.3d 619, 625 (7th Cir. 2004) (affirming denial of
summary judgment where "[t]he record . . . suggest[ed] that [the
plaintiff's supervisor] used his 'good old boy' network to favor
those he liked and ostracize those he disliked . . . .");

Similarly, Bolden's claim that Adams failed to deal with her
coworker Bonnie's intentional failure to flush the toilet does
not constitute a material adverse action and cannot be causally
linked to Bolden's protected activity.  Bolden testified that
when she approached Adams about the toilet not being flushed,
"all [Adams] did was laugh, go in the bathroom, and flush it."
(Bolden Dep. 82.)  Although this happened on "many occasions,"
Adams continued to respond by flushing the toilet.  (Id. 84.)
Eventually, on what became the "last time" the incident occurred,
Adams had a plumber come to deal with the problem. (Bolden Dep.
85.)  Assuming that Bonnie was deliberately targeting Bolden,
there is no evidence that Adams was involved.  The evidence shows
only Adams took steps to resolve the problem, and eventually did.
 Bolden had no personal knowledge about whether Adams talked to
Bonnie about this and produces no other evidence to suggest that
she did.  Further, after the plumber came, the incident stopped
occurring.  Finally, as noted above, Title VII does not set forth

a general civility code.  Even if the action were deliberately
caused as part of a conspiracy between Adams and Bonnie to annoy
or upset Bolden, the incident discussed would not dissuade a
reasonable worker from making or supporting a charge of
discrimination.

The plaintiff also complains of a paper suspension she
received on February 16, 2009 for failing to report a workplace
injury.  Even taken together with the other incidents of which
she complains, this discipline fails to rise to the level of an
adverse employment action, because it was reduced to a warning.
See, e.g., Martinez v. N.Y. City Dept. of Educ., No. 04 Civ.
2728(LTS)(DFE), 2008 WL 2220638, at *10 n.11 (S.D.N.Y. May 27,
2008) ("[R]epeated written warning to and meetings with Plaintiff
do not constitute adverse employment actions . . . .").  It is
true that this discussion in Martinez arose in the context of
disparate treatment rather than retaliation and that the
provisions are not coterminous.  However, a single warning cannot
form the basis of a retaliation claim.  Although it is
conceivable that persistent discipline, even without tangible
impact, might dissuade a reasonable worker from making or
supporting a charge of discrimination, a single instance of
discipline that has no tangible harm to the employee is

21

insufficient to do so.[7]

Other incidents described by the plaintiff have no possible causal connection to her protected activity.  Several of these incidents occurred before May 31, 2006, the date the plaintiff first engaged in protected activity, and so cannot form the basis for her retaliation claim.  The incident where Adams threw a parcel that hit the plaintiff and yelled at her occurred in early May of 2006, and Bolden's attempt to transfer to Georgia, including Adams's allegedly inadequate failure to help her, occurred later that month.[8]

_____

[7]Related to the above incident, Bolden also alleges in her complaint that in January of 2007, her medical documentation was rejected because it was not specific enough.  However, in her deposition she states instead that she was told to take vacation for her broken finger and that she would eventually be reimbursed for her workers' compensation claim.  Although Bolden testified that she filed a workers' compensation claim, she testified shortly thereafter that she "d[id]n't remember filling out any papers," and that she "was supposed to be" reimbursed because she used her vacation time. (Bolden Dep. 152.) There is no evidence at all of her medical documentation being rejected as inadequate and no evidence that the person responsible for compensating her for her vacation time was aware of her protected activity, or even evidence as to that person's identity.

[8]The court notes that the parcel-throwing incident would not likely amount to an adverse employment action, were the court to reach that issue.  The plaintiff testified that she did not believe that Adams intentionally hit her with the parcel. (See Bolden Dep. 59, 64-65.)  Instead, her quarrel is with Adams's failure to apologize, (see id.), and for Adams's saying that she was "sick of [Bolden's] snide remarks about Bonnie." (Id. 67.) It is well established that Title VII does not protect employees against the "petty slights or minor annoyances that often take place at work and that all employees experience." White, 548 U.S. at 68.

Similarly, the plaintiff's allegation that there was mis-delivered mail on her route that she did not deliver also cannot form the basis for Bolden's retaliation claim, because there is no evidence that Adams participated in this in any way.  Bolden stated at her deposition that she saw her coworker Andy driving on her route one day after she had finished delivering the mail, but there is no evidence that Adams was aware of this.  Consequently, even giving the plaintiff the benefit of an inference that Andy was driving there in order to mis-deliver mail, something that Bolden does not claim that she saw, there is no evidence of a causal connection between Andy's presence on her route and Bolden's protected activity.[9]

Bolden also testified about a number of ways in which Post Office procedure was used to treat her differently than her coworkers.  First, she testified that she had to sort some of her mail on the road, while her coworkers were allowed to sort theirs in the office.  Bolden's testimony indicates only that Adams said that they were required to sort the mail in the office, however; there is no evidence that Adams knew that the other employees were not doing so.  All the evidence demonstrates is that eventually, Adams "got strict and she said, Everybody [sic] had to take it.  But prior to that Bonnie was not taking hers out."

---

[9]In addition, although Bolden testified that Andy did not "live in that vicinity" of the route, (Bolden Dep. 99), Andy did live on her route.

23

(Bolden Dep. 91.)  In short, the evidence shows no more than that Adams gave all her workers an instruction to follow a policy, and some "months" later made clear to all her workers that they were all to follow it. (Id. 92.)

Second, Bolden testified that before Adams started working as Postmaster, the mail carriers at East Granby would call addressees of express mail prior to making a delivery in order to make sure someone would be at the address to receive the package. After Adams started, Bolden was informed that the carriers were to deliver the packages without calling first.  She noticed, however, that other coworkers were still calling before making their deliveries, and spoke to Adams about it.  Bolden testified that when she asked Adams about this "She said – I don't remember, I don't recall what she said exactly – but, she gave me some kind of excuse why they was [sic] calling.  I don't recall what she said, but it was something." (Bolden Dep. 118.)  When asked if she knew whether her coworkers simply ignored the policy change, Bolden admitted she didn't know.  This testimony is not sufficient to suggest a causal connection between Bolden's protected activity and any adverse action by Adams.[10]

---

[10]In addition, Bolden's own testimony provides a legitimate, non-discriminatory explanation for the disparate treatment. Bolden testified that one of her coworkers, Carol, "was slow, but Carol got away with a lot because she was slow." (Bolden Dep. 76.)  Bolden then mentioned policies Bolden had to follow that Carol did not, not because Bolden was being discriminated or retaliated against, but because "Carol was slow." (Id.)

Third, the plaintiff testified that she had to sort her misdirected mail after she finished her deliveries, while her coworkers were allowed to leave theirs unsorted.  However, Bolden explained that her basis for this belief is that on the "few" occasions when she came back later than the other workers, she saw their mail in the post office. (Id. 93.)  Adams testified that it appeared to her that the prior Postmaster did not follow a number of procedures, and that as she became aware of procedures not being followed, she wrote letters to the staff clarifying the correct procedure.  There is no evidence that Adams knew about Bolden's co-workers leaving mail on those particular occasions.

Finally, Bolden testified that she was not allowed to use her cellular telephone in the post office.  She elaborated that "in the middle of [a] meeting," she took a telephone call, and "that's when [Adams] said, [']No phone calls.[']" (Bolden Dep. 120-21.)  After that, other employees used their cell phones at work, but Bolden did not.  This does not demonstrate retaliation for protected activity, even though Bolden chose not to use her cellular phone in the office after this incident and other employees did.[11]

_____

[11]Bolden's complaint also refers to "the issuance of new keys" as a procedural change that Bolden was not made privy to. (Am. Compl. (Doc. No. 14) 3-4.)  However, when asked about this at her deposition, Bolden stated that she "d[id]n't recall what that was." (Bolden Dep. 120.)

The final issue that Bolden complains of is that she didn't receive a raise when Adams was postmaster, although she had received one every previous year that she worked at the East Granby Post Office.  Assuming _arguendo_ both that this incident is sufficient to constitute an adverse employment action and that the plaintiff has established a causal connection between it and her protected activity, the defendant has met its burden of "articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action," Hicks, 593 F.3d at 164 (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005), and the plaintiff has not met her burden of producing evidence that could "show that retaliation was a substantial reason for the adverse employment action," which can be accomplished by showing that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause." Hicks, 593 F.3d at 164 (citations omitted) (internal quotation marks omitted).  There is no evidence that any other employees received a raise, or that Bolden herself was entitled to one.  Bolden testified that her raise was dependant on the result of her mail count, and that her mail count had not increased.  While Bolden testified that there was "a new development that was going up all the time" in East Granby and that "those houses had to be divided up," there is no evidence of any procedure by which they should have been divided, that the new houses were on or near her route,

26

or that she was otherwise entitled to deliver mail to those
houses. (Bolden Dep. 106.)  Based on this record, a reasonable
jury could not conclude that retaliation for her protected
activity was a substantial reason for the plaintiff's failure to
get a raise when Adams was postmaster.

### C.   Intentional Infliction of Emotional Distress

The defendant makes several arguments as to why the
plaintiff's intentional infliction of emotional distress claim
should be dismissed.  First, the plaintiff argues that this tort
claim is preempted by Title VII.  The Supreme Court has held that
Title VII "provides the exclusive judicial remedy for claims of
discrimination in federal employment."  Brown v. Gen. Servs.
Admin., 425 U.S. 820, 835 (1976).  This requires that the
plaintiff's state law claims "duplicative of her claims under
Title VII" must be dismissed.  Burritt v. Potter, Civ. No.
3:06CV01754(AWT), 2007 WL 1394136, at *4 (D.Conn. May 10, 2007)
(quoting Lucenti v. Potter, 432 F.Supp.2d 347, 366 (S.D.N.Y.
2006).  However, Bolden's intentional infliction of emotional
distress claim is not a claim of discrimination, and so it is not
duplicative of her Title VII claim.  In order to recover for
intentional infliction of emotional distress, the plaintiff must
prove different elements than she must prove to recover for

discrimination.[12]

Second, the defendant argues that the plaintiff's intentional infliction of emotional distress claim arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. ("FTCA"), and should be dismissed because, since the plaintiff has failed to exhaust her administrative remedies as required by that statute, the court has no jurisdiction over this claim. See, e.g., Celestine v. Mount Vernon Neighborhood Health Ctr., 403 F.3d 76, 82 (2d. Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court. This requirement is jurisdictional and cannot be waived."); Burritt, 2007 WL 1394136, at *4 (determining intentional infliction of emotional distress claim by a postal

_____

[12] Lucenti does hold that an intentional infliction of emotional distress claim is duplicative of a Title VII claim. See Lucenti, 432 F.Supp.2d at 366. However, the only authority it cites in support of the proposition that "federal employees possess no private cause of action outside Title VII and the Rehabilitation Act for employment discrimination" is Serrano v. Runyon, No. 3:95-469(DJS), 1997 WL 718976, at *5 (D. Conn. Aug. 22, 1997). In Serrano, the court dismissed the plaintiff's claims under the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut's employment discrimination statute, not a state tort claim. (The plaintiff's state tort claims in Serrano were dismissed for lack of jurisdiction under the Federal Tort Claims Act, not Title VII. See id.) While CFEPA claims are duplicative of Title VII, this intentional infliction of emotional distress claim is not. Compare Burritt, 2007 WL 1394136 at *4-*5 (noting, in context of the plaintiff's failure to point to any additional conduct, that intentional infliction of emotional distress claim was preempted "[t]o the extent the claims are duplicative," but dismissing the intentional infliction of emotional distress claim for failure to exhaust administrative remedies under the Federal Tort Claims Act).

worker against his employer arose under FTCA); <u>Boehme v. U.S.
Postal Serv.</u>, 343 F.3d 1260, 1263 (10th Cir. 2003) ("[F]or state
tort claims arising out of the activity of the Postal Service, §
409(c) compels the application of the FTCA and its attendant
provisions.").

The plaintiff argues in response that because she is a
federal employee, her claims are governed by the Federal
Employees' Compensation Act, 5 U.S.C. § 8101, <u>et seq</u>. ("FECA"),
and "it is a substantial open question as to whether or not the
type of emotional distress damages claimed by Bolden in the
instant matter are covered under the FECA." (Pl.'s Opp. 32.)
Bolden argues that the claim should be permitted to stand unless
the Secretary of Labor determines that this type of claim is
covered under the FECA, in which case FECA provides an exclusive
remedy.

"[I]f the Secretary determines that the type of claim
involved does not implicate the FECA, then the FTCA claim may
proceed." <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 83 (2d Cir.
2008).  As a result, to recover in tort Bolden must first apply
for administrative relief under the FECA, and, if the Secretary
of Labor were to determine that the FECA did not apply, she must
then make a claim under the FTCA.  Only after exhausting her
remedies under the FTCA could she then litigate the claim in
federal court.  <u>Celestine</u>, 403 F.3d at 82 ("The FTCA requires

that a claimant exhaust all administrative remedies before filing
a complaint in federal district court.  This requirement is
jurisdictional and cannot be waived.").

Unlike under the FTCA, "[e]ven in situations where the
district court deems it highly unlikely that the claim falls
outside the scope of the FECA, subject matter jurisdiction over
the case remains with the court until the Secretary [of Labor]
has made that determination." Mathirampuzha, 548 F.3d at 83.
However, "[t]he burden of demonstrating subject-matter
jurisdiction lies with the party asserting it, as does the burden
of filing a timely FECA claim." Mathirampuzha, 548 F.3d at 85
(citations omitted).  Here, the plaintiff neither alleges in her
complaint nor asserts in her opposition to the motion for summary
judgment that she has filed either a FECA claim or an
administrative tort claim under the FTCA.  Thus, the court has
jurisdiction until there is no possibility that the Secretary of
Labor may determine that her claim is covered by the FECA.  After
that, the claim falls under the FTCA, and the court loses
jurisdiction because of the plaintiff's failure to exhaust
administrative remedies under that scheme.[13]

---

[13]Unlike Mathirampuzha, where the plaintiff pled a FTCA
claim, see id. at 72, and so denial of coverage by the Secretary
of Labor would enable that claim to go forward, the plaintiff has
not done so here.  So a denial here would mean that the
plaintiff's claim was covered by the FTCA, and because she has
failed to exhaust her remedies under that statute, the court
would have no jurisdiction to entertain her claim.  The court's

Under the FECA, "[a]n original claim for compensation for disability or death must be filed within three years after the injury or death."  5 U.S.C. § 8122(a). Further,

> Compensation for disability or death . . . may not be allowed if claim is not filed within that time unless--
>
> (1) the immediate superior had actual knowledge of the injury or death within 30 days. The knowledge must be such to put the immediate superior reasonably on notice of an on-the-job injury or death; or
>
> (2) written notice of injury or death as specified in section 8119 of this title was given within 30 days.

Id.  "In the case of latent disability, the time for filing claim does not begin to run until the employee has a compensable disability and is aware, or by the exercise of reasonable diligence should have been aware, of the causal relationship of the compensable disability to [her] employment."  5 U.S.C. § 8122(b).  The plaintiff testified in her deposition that she saw a psychiatrist named Carol Porter while she was still employed with the Postal Service because of depression caused by how she was being treated.  Bolden recalls she stopped seeing Porter around April, 2007.  She has not established, however, that Adams had actual knowledge of her depression or notice that would

---

jurisdiction as to this claim remains only in the lacuna between the FECA and the FTCA-- and thus exists only while there is uncertainty as to the Secretary of Labor's decision.

satisfy 5 U.S.C. § 8119 within 30 days of its onset.[14]  Bolden's
employment with the Postal Service ended on May 10, 2007.  Thus,
the latest she could file a timely FECA claim, and the last day
that the court could have jurisdiction, is May 10, 2010, unless
Bolden's "failure to comply is excused by the Secretary on the
ground that such notice could not be given because of exceptional
circumstances." 5 U.S.C. § 8122(d)(3).  Consequently, unless the
court receives notice from the plaintiff by May 10, 2010 that the
plaintiff has filed an administrative FECA claim, the court will
assume that it no longer has jurisdiction over this claim
starting on that date.[15]

---

[14]Adams testified that she found Bolden's letter of
resignation "kind of surprising." (Adams Dep. 45.)  She testified
that the only complaints Bolden made to her about the workplace
involved the toilet incident.  She testified that other employees
had commented that Bolden's personality had changed and she was
more "impatient," "snapping" at them. (Id. 89; see id. 44-45, 89-
90.)

[15]The court notes that were it to reach the merits of the
claim, it would likely fail, because the conduct complained of
does not appear to be "extreme and outrageous" as a matter of
law.  Compare Burke v. State, Dep't of Children & Families, No.
MMXCV065000409S, 2010 WL 797286 at *3 (Conn. Super. Ct. Feb. 2,
2010) ("[I]n cases like the plaintiff's, involving coworkers, the
court has found that derogatory comments made by one worker to
another are not enough to support a claim of intentional
infliction of emotional distress.") with Berry v. Loiseau, 223
Conn. 786, 793 (1992) (affirming judgment of intentional
infliction of emotional distress where the "jury could reasonably
have found" that "[d]uring the course of the plaintiff's
employment . . . he was subjected to repeated physical abuse[,]
. . . including being punched and choked.").

## IV.   CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment (Doc. No. 36) is hereby GRANTED in part. Summary judgment in favor of the defendant shall enter with respect to the plaintiff's claims for discrimination and retaliation in violation of Title VII.

The plaintiff's claim for intentional infliction of emotional distress will be placed on the court's inactive docket so that the plaintiff can file a FECA claim and await a determination by the Secretary of Labor regarding whether or not the FECA covers her claim. See Mathirampuzha, 548 F.3d at 84.  If the plaintiff does not give notice that a claim has been filed by May 10, 2010, the court will enter judgment in favor of the defendant on the claim for intentional infliction of emotional distress.

It is so ordered.

Signed this 29th day of March, 2010 at Hartford, Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
